**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FRIANT WATER AUTHORITY,** *et al.*, | **Case No. 1:14-CV-000765-LJO-BAM** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER (DOC. 3)** |
| v. | |
| **SALLY JEWELL, as Secretary of the UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.*, | |
| **Defendants,** | |
| **SAN JOAQUIN RIVER EXCHANGE CONTRACTORS WATER AUTHORITY,** *et al.*, | |
| **Intervenors,** | |
| **SAN LUIS & DELTA-MENDOTA WATER AUTHORITY,** *et al.*, | |
| **Defendant-Intervenors.** | |

## I. INTRODUCTION

Plaintiff Friant Water Authority ("Friant") is a California joint powers authority that consists of twenty-one member water, water conservation, water storage and irrigation districts, as well as the City of Fresno, all located on the east side of the southern San Joaquin Valley. Friant and its member agencies[1] (collectively, "Plaintiffs") bring this lawsuit against the United States Department of the Interior ("Interior"), Interior's member agency, the United States Bureau of Reclamation ("Reclamation" or "the Bureau"), as well as various federal officers[2] (collectively, "Federal Defendants"). Also named as defendants are Grassland Water District ("GWD") and Grassland Resource Conservation District ("GRCD") (collectively, "Grasslands"). *See generally* Doc. 1

---

[1] The member agencies are: the City of Fresno, Fresno Irrigation District, Arvin-Edison Water Storage District, Delano-Earlimart Irrigation District, Exeter Irrigation District, Ivanhoe Irrigation District, Kaweah Delta Water Conservation District, Kern-Tulare Water District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Madera Irrigation District, Orange Cove Irrigation District, Pixley Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Stone Corral Irrigation District, Tea Pot Dome Water District, Terra Bella Irrigation District, and Tulare Irrigation District. Doc. 1 ("Compl.") at 1 & ¶¶ 12-28.

[2] The Complaint also names Sally Jewell, Secretary of the United States Department of the Interior; Lowell Pimley, Acting Commissioner of the Bureau; David Murillo, Regional Director of the Bureau; and Michael Jackson, Area Manager of the South-Central California Area Office of the Bureau. Compl. at 2.

("Compl.").

Friant's members contract with Reclamation for the delivery of water from the Friant Unit of the Central Valley Project ("CVP"). One of the principal features of the Friant Unit is Friant Dam, located in the foothills northeast of the City of Fresno, which impounds the waters of the upper San Joaquin River in Millerton Lake. Before the Court for decision is Friant's motion for a temporary restraining order ("TRO"), seeking to enjoin Federal Defendants, from continuing to release water from Millerton to satisfy the demands of downstream "Exchange Contractors." Doc. 4. The Exchange Contractors hold priority "Exchange Contracts" with Reclamation, reflecting the fact that the Exchange Contractors held rights to the waters of the San Joaquin River that pre-date Reclamation's construction of the Friant Unit. *See* Compl. at ¶¶ 2, 3.

Reclamation normally satisfies the demands of the Exchange Contractors by providing them with "substitute water" transported from Northern California through facilities in the Sacramento-San Joaquin Delta, thereby freeing up much of the water stored at Millerton for use by Friant's members. In recent weeks, however, Reclamation began releasing water from Millerton to satisfy the Exchange Contractors' demands. According to Plaintiffs, Reclamation is doing so because it has decided to allocate some of the water that normally would serve as "substitute water" to wildlife refuges and the State Water Project ("SWP"). Compl. at ¶ 10. As a result, Reclamation has allocated no water to the Friant member agencies in 2014. *Id*. at ¶ 9. According to Plaintiffs, this "means nothing less than the collapse of the agriculture-dependent economies of Madera, Fresno, Tulare, and Kings Counties." Doc. 4 at 6. Plaintiffs argue Reclamation's actions violate the terms of the Friant users' contracts with Reclamation; the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102-575, 106 Stat. 4600; and Section 8 of the 1902 Reclamation Act, 43 U.S.C. § 383.[3]

Oppositions to the TRO motion were filed by Federal Defendants, Doc. 34; and Grasslands, Doc.

---

[3] These arguments correspond with the first through third claims for relief in Plaintiffs' Complaint. The Complaint contains two additional causes of action, but Plaintiffs do not raise those claims in their TRO papers. Accordingly, the Court will not address the fourth and fifth claims here.

30. The Court granted motions to intervene filed by the Exchange Contractors, and by San Luis & Delta

Mendota Water Authority and one of its member agencies, Westlands Water District. Docs. 43 & 44.

Both sets of intervenors also filed oppositions. Doc. 29 & 36.

## II. STANDARD OF DECISION

In order to secure injunctive relief[4] prior to a full adjudication on the merits, a plaintiff must

show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is

"an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to

such relief." *Id*. at 22.

The Ninth Circuit follows a "sliding scale" approach to preliminary injunctions. *See Alliance for*

*the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, a weaker

showing as to the likelihood of success on the merits may be offset by a stronger showing with respect

to the balance of the equities. *Id.* at 1131-32. For example, if the moving party is unable to establish a

likelihood of success on the merits, preliminary injunctive relief may still be had if the party can show

that (1) there are at least "serious questions" going to the merits; (2) the balance of the hardships tips

"sharply" in its favor; and (3) the other factors listed in *Winter* (i.e., irreparable harm and in the public

interest) are satisfied. *Id.* at 1135. "Serious questions" in the context of preliminary injunctive relief are

those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus

for more deliberative investigation." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.

1988) (citation and internal quotation marks omitted). They do not need to "promise a certainty of

success, nor even present a probability of success, but must involve a fair chance of success on the

merits." *Id.* (citation and internal quotation marks omitted).

---

[4] The substantive standard for granting a temporary restraining order is the same as the standard for entering a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1347 n. 2 (1977).

### III. FACTUAL BACKGROUND

**A.    The CVP.**

In *Westlands Water District v. United States*, 337 F.3d 1092 (*Westlands VII*)[5], the Ninth Circuit

succinctly summarized the history of relevant aspects of the CVP:

#### A. Central Valley Project

The Central Valley Project ("CVP") is "the largest federal water management project in the United States." *Central Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002). "[L]ocated in the Central Valley Basin of California, which is roughly 400 miles long by 120 miles wide, [it] includes the major watersheds of the Sacramento and San Joaquin river systems." *Id.* These two river valleys merge at the Sacramento San Joaquin Delta, where the waters mix and then flow through the Carquinez Strait into the San Francisco Bay, continuing to the Pacific Ocean. *Id.*; *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950). The Sacramento River has almost twice as much water as the San Joaquin River but the Sacramento Valley has very little tillable soil, while about "three-fifths of the [San Joaquin] valley lies in the domain of the less affluent San Joaquin." *Gerlach Live Stock*, 339 U.S. at 728; *see also Dugan v. Rank*, 372 U.S. 609, 612 (1963). To alter this imbalance and to make water available to the San Joaquin Valley, the state of California embarked on re-engineering its natural water distribution through the authorization of the Central Valley Project ("CVP"). [The] United States took over administration of this project in 1935. *Gerlach Live Stock*, 339 U.S. at 728.

---

[5] *Westlands VII* is the culmination of a series of decisions that may be referenced as follows to keep numbering consistent with the scheme set forth in *Westlands VII*:

- *Westlands Water Dist. v. U.S. Dept. of Interior*, 805 F. Supp. 1503 (E.D. Cal. 1992) ("*Westlands 0*") (granting motion for judgment on pleadings filed by Friant, and joined by Exchange Contractors, and motion to dismiss filed by United States, concerning priority rights of Exchange Contractors).
- *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir. 1993) ("*Westlands I*") (affirming district court decision that Bureau did not act arbitrarily and capriciously in 1992 water allocation decisions, but declining to rule on contractual obligations to apportion water).
- *Westlands Water Dist. v. United States*, 850 F. Supp. 1388 (E.D. Cal. 1994) ("*Westlands II*") (granting motion to dismiss certain claims, but denying motion as to contract claims).
- *Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536 (E.D. Cal. 1994) ("*Westlands III*") (denying motion for preliminary injunction, with lengthy analysis of Exchange Contract and Friant contracts).
- *Westlands Water Dist. v. Patterson*, 900 F. Supp. 1304 (E.D. Cal. 1995) ("*Westlands IV*") (granting summary judgment that Exchange Contractors were prior and prevented apportionment with junior users of San Luis Reservoir).
- *Westlands Water Dist. v. United States*, 100 F.3d 94 (9th Cir. 1996) ("*Westlands V*") (vacating *Westlands IV* because plaintiffs should have been granted leave to voluntarily dismiss under Fed. R. Civ. P. 41(a)(2), and remanding for consideration of attorney's fees for voluntary dismissal).
- After voluntary dismissal on remand from the Ninth Circuit was conditioned on payment of attorney's fees, plaintiffs decided not to dismiss, and summary judgment motions were briefed. *Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133 (E.D. Cal. 2001) ("*Westlands VI*") (granting summary judgment in favor of United States, Exchange Contractors, and Friant water-users).
- *Westlands Water Dist. v. United States*, 337 F.3d 1092 (9th Cir. 2003) ("*Westlands VII*") affirming summary judgment in favor of United States, Exchange Contractors, and Friant).

The CVP's purpose is to "improv[e] navigation, regulat[e] the flow of the San Joaquin River and the Sacramento River, control[ ] floods, provid[e] for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy." Act of August 26, 1937, Pub. L. No. 75 392, 50 Stat. 844, 850. To accomplish the project's purposes, CVP's construction includes a series of many dams, reservoirs, hydropower generating stations, canals, electrical transmission lines, and other infrastructure. *Gerlach Live Stock*, 339 U.S. at 733.

The United States Bureau of Reclamation ("Bureau"), a division of the Department of the Interior, operates the CVP. The California State Water Resources Control Board grants permits for water appropriation from the CVP. The Bureau appropriates water from various sources and delivers it to permit holders for beneficial uses. *Central Delta Water*, 306 F.3d at 943.

**1. San Luis Unit of the CVP**

The San Luis Unit, one of the many water management units of the CVP, was authorized by the San Luis Act of 1960. Pub. L. No. 86–488, 74 Stat. 156 (June 3, 1960). The San Luis Unit, an integral part of the CVP, consists of the San Luis Dam and the San Luis Reservoir. The San Luis Reservoir was constructed to provide water to Merced, Fresno and King Counties, and is used to store surplus water from the Sacramento–San Joaquin Delta, for delivery to contractors such as Westlands and San Benito. The Tracy Pumping Plant pumps water from the Sacramento–San Joaquin Delta into the Delta–Mendota Canal. The Delta–Mendota Canal, located south of the Sacramento–San Joaquin Delta, channels water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir. *Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536, 1539 (E.D. Cal. 1994) (*Westlands III* ).

**2. Friant Unit of the CVP**

Around 1939, the Bureau took over construction of a dam on the San Joaquin River that eventually created Lake Millerton and the Friant Unit of the Central Valley Project. *See Gerlach Live Stock Co*., 339 U.S. at 728–29; *Westlands III*, 864 F. Supp. at 1539. The Friant Unit impounds the waters of the San Joaquin River at a dam constructed at Friant, California, approximately sixty miles upstream from Mendota, diverting a major portion of the flow of the San Joaquin River both to storage in Millerton Lake and into the Friant–Kern and Madera Canals for delivery to local water users. *Dugan*, 372 U.S. at 612–13. The CVP also diverts water from the Sacramento River into the San Joaquin Valley to make additional water available for use in the San Joaquin Valley.

**B. Exchange Contractors**

To fulfill the purposes of the Rivers and Harbors Act of 1937, the Secretary of the Interior was given the right to acquire water rights for the development of the CVP. Act of August 26, 1937, Pub. L. No. 75–392, 50 Stat. 844, 850. The Exchange Contractors hold both pre-1914 riparian and appropriative rights to the San Joaquin River. Cal. State Water Rights Bd. Dec. D–935, 80 (1959). The district court noted that the cooperation of the Exchange Contractors made possible the expansion of the CVP and the San Luis Unit. *Westlands Water Dist. v. United States*, 153 F. Supp.2d 1133, 1146-47 (E.D. Cal. 2001) (*Westlands VI*). To provide a reliable source of water for its proposed canals, the Bureau had to assure that the Exchange Contractors' pre-existing rights would be satisfied. *Westlands III*, 864 F. Supp. at 1539.

In 1939, the Exchange Contractors entered into two contracts with the United States: a Purchase Contract and an Exchange Contract. "Under the Purchase Contract, the Exchange Contractors sold all [of] their San Joaquin River water rights to the United States, except for 'reserved water,' water to which the Exchange Contractors [hold ] vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their [reserved water] rights" to the San Joaquin River, so long as they receive certain volumes of substitute water. *Id.*

Pursuant to the Exchange Contract, the exchange of water is a conditional permanent substitution of water supply. The United States has a right to use the Exchange Contractors' water rights "so long as, and only so long as, the United States does deliver to the Contracting Entities by means of the Project or otherwise substitute water in conformity with this contract." The Exchange Contract defines "substitute water" as "all water delivered ... regardless of source." The contract further provides that "[i]t is anticipated that most if not all of the substitute water provided the [Exchange Contractors ] hereunder will be delivered to them via the [ ] Delta–Mendota Canal."

Water allocation in any year is designated as a full year supply of 100 percent. In critical years, the water supply can be reduced by approximately twenty-five percent. If there exists a temporary interruption of waters from the Delta-Mendota Canal, the [Exchange] contract provides that the United States will deliver water stored in Millerton Lake behind the Friant Dam.

*Westlands VI*, 337 F.3d at 1095-97 (footnotes omitted).

**B.**    <u>**Exchange Contracts.**</u>

Article 4a of the Exchange Contracts, "Conditional Permanent Substitution of Water Supply," authorizes the United States to annually exercise the Exchange Contractors' San Joaquin River water rights, conditioned on a return supply of substitute water:

> The United States may hereafter, either in whole or in part, store, divert, dispose of and otherwise use, within and without the water-shed of the aforementioned San Joaquin River, the aforesaid reserved waters of said river for beneficial use by others than the [Exchange Contractors] so long as, and only so long as, the United States does deliver to the [Exchange Contractors] by means of the [Central Valley] Project or otherwise substitute water in conformity with this contract.

Declaration of Jennifer Buckman, Doc. 15, Ex. E. at art. 4a.

Article 4b grants the Exchange Contractors a federal contractual right to receive San Joaquin River water during temporary interruptions of delivery of the substitute waters:

> Whenever the United States is temporarily unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water from the Delta–Mendota Canal or other sources, water will be delivered from the San Joaquin River as follows:
>
> (1) During this period, for the first 7 consecutive days, in the quantities and rates as specified in Article 8 of this contract;
>
> (2) For the balance of this period, in quantities and rates as reserved in the Purchase Contract, except that the United States further agrees that if the resulting delivery of water would be less than seventy-two per centum (72%) of Schedule One in said Purchase Contract then the United States shall make up such quantities by releases of available storage from Millerton Lake, provided, however, that the United States shall in no event be required to draw the storage in Millerton Lake below Elevation 464.00 U.S.G.S. datum or to retain water in storage for such releases.

*Id*. at art. 4b.

If the government permanently fails to provide the Exchange Contractors with substitute water, Exchange Contract Article 4c requires the government to release the "reserved" San Joaquin River water (they continue to own) held at Friant Dam:

> Whenever the United States is permanently unable for any reason or for any cause to deliver to the [Exchange Contractors] substitute water in conformity with this contract, the [Exchange Contractors] shall receive the said reserved waters of the San Joaquin River as specified in said Purchase Contract and the United States hereby agrees to release at all such times said reserved waters at Friant Dam.

*Id*. at art. 4c.

The Exchange Contracts expressly reserve discretion to the United States to provide substitute water from "the Sacramento River, the Sacramento-San Joaquin Delta and other sources through the

7

Delta-Mendota Canal of [the CVP] and by other means." *Id*. at 3. The Exchange Contracts also

"anticipated that most if not all of the substitute water provided the [Exchange Contractors] will be

delivered to them via the aforementioned Delta-Mendota Canal." *Id*. at art. 5a. "By this language, the

Bureau contractually selected the Sacramento River, Delta, and Delta–Mendota Canal as the primary

source of substitute water." *Westland Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1152-54 (E.D.

Cal. 2001) ("*Westlands VI*").

## C.   Friant Water Users' Contracts.

When the San Luis Unit was added to the CVP, water districts that received water from the

Friant Division were concerned that addition of the San Luis Unit, which provides water to various

water districts on the west side of the San Joaquin Valley, "could reduce availability of Sacramento

River and Delta water, which would require the Exchange Contractors to exercise their San Joaquin

River water rights in future times of shortage, which in turn would reduce" water available to the Friant

Unit contractors. *Westlands VI*, 153 F. Supp. 2d at 1156. *Westlands VI* discussed a December 29, 1959,

letter, in which H.P. Dugan, Director of Region 2 of the Bureau of Reclamation, wrote:

> I confirm to you that it has been, is, and will continue to be the policy and
> practice of the United States to utilize the water available to it or made
> available to it [from] ... the Sacramento River and its tributaries and the
> Sacramento–San Joaquin Delta to first satisfy the requirements of the
> Exchange Contract and Schedule 2 of the Purchase Contract so long as it
> is legally and reasonably physically possible for it to satisfy these
> requirements.

*Id*. at 1155-56 (internal citation omitted)

Friant water users requested their existing contracts be amended to cause the United States to do

everything to ensure that the Exchange Contractors receive their full allocation of substitute water, to

prevent them from exercising their San Joaquin River water rights to the detriment of those water-

districts. *Id*. at 1156. Eventually, all of Plaintiffs' contracts with Reclamation were amended to provide:

> The United States agrees that it will not deliver to the Exchange
> Contractors thereunder waters of the San Joaquin River unless and until
> required by the terms of said contract, and the United States further agrees
> that it will not voluntarily and knowingly determine itself unable to deliver
> to the Exchange Contractors entitled thereto from water that is available or

that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States under said Exchange Contract.

Buckman Decl., ¶ 3 & Ex. A at art. 3n.

**D.    Grasslands.**

GWD, a public agency formed under California law, operates and manages the conveyance system that delivers water to eight wildlife habitat areas ("refuges") covering approximately 75,000 acres in the western San Joaquin River Valley. Declaration of Ricardo Ortega, Doc. 30-2, at ¶ 1. GWD receives water from Reclamation through the CVP, and delivers it to units of the San Luis National Wildlife Refuge managed by the United States Fish and Wildlife Service ("USFWS"), the Los Banos and North Grasslands Wildlife Areas managed by the California Department of Fish and Wildlife ("CDFW"), and privately managed wetlands in GCRD. *Id.* at ¶ 3.

GWD and the refuges it serves rely almost exclusively on the water delivered by Reclamation through the CVP under long-term contracts for the delivery of refuge water supplies ("Refuge Contracts"). *Id.* at ¶ 4. GWD's water supplies are dedicated under the CVPIA as permanent "mitigation for fish and wildlife losses incurred as a result of construction, operation, or maintenance of the Central Valley Project." CVPIA § 3406(a); Ortega Decl. at ¶ 5. CVPIA refuges have been continually managed for wildlife purposes since the construction of Friant Dam on the San Joaquin River in the early 1940's, which altered the natural flood hydrology of the lower San Joaquin River. Ortega Decl. at ¶ 7. The refuges are "managed" habitats: refuge managers provide controlled applications of water using a series of canals and control structures, mimicking historical flood patterns with pulses of high water flow during winter and spring. *Id.*

The refuges served by GWD are within the Grasslands Ecological Area ("GEA"). *Id.* at ¶ 5. The GEA is the largest freshwater wetland complex west of the Rocky Mountains. *Id.* It is the largest component of the remaining approximately five percent of historical wetlands that once covered vast tracts of California's Central Valley. *Id.* Refuges within the GEA are located south of the Sacramento-

9

1   San Joaquin Delta ("Delta") and they encompass the majority of the wildlife habitat mitigation areas

2   listed in CVPIA section 3406(d). *Id.*

3       The GEA provides crucial habitat for the survival of millions of migratory waterfowl and other

4   birds each year, as well as hundreds of other protected species, including the last known population of

5   the threatened giant garter snake in the western San Joaquin Valley. *Id.* at ¶ 6.The GEA is a key stop for

6   migrating birds on the Pacific Flyway, an internationally significant north-south migratory waterfowl

7   corridor, and is designated as a critically important habitat area under two international treaties: as a

8   "Wetland of International Significance" under the international RAMSAR Convention on Wetlands, and

9   an "Area of International Concern" under the North American Waterfowl Management Plan, an

10  international treaty among the United States, Canada, and Mexico. *Id.* The GEA is also designated as an

11  Audubon Important Bird Area and a Western Hemisphere Shorebird Reserve Network Site of

12  International Importance. *Id.*

13      Under both the CVPIA and the Refuge Contracts, there are two categories of CVP refuge water

14  supplies: "Level 2" represents two thirds of the water needed to sustain the refuges, and "Incremental

15  Level 4" represents the remaining one third (the full amount is called "Level 4"). *Id.* at ¶ 8; Affidavit of

16  Ellen Trescott, Ex. A at 10-11, Contract Article 3; CVPIA §§ 3406(d)(1) and (2). Reclamation delivers

17  125,000 acre-feet of Level 2 refuge water supplies annually to GWD for the privately managed wetlands

18  in the GRCD (the full congressionally mandated Level 4 amount is 180,000 acre-feet). *Id.* GWD also

19  conveys 30,000 acre-feet of Level 2 water to other refuges within the GEA. *Id.* This Level 2 water is

20  typically diverted from the Delta, stored in San Luis Reservoir temporarily, and delivered to refuges

21  when needed in the fall, winter, and spring. *Id.* Incremental Level 4 supplies are obtained from other

22  sources, primarily water purchased from other members of the San Luis & Delta Mendota Water

23  Authority, including the San Joaquin River Exchange Contractors. *Id.*

24      In critically dry hydrologic years, the Refuge Contracts and section 3406(d) of the CVPIA

25  authorize reductions in Level 2 refuge water deliveries by no more than 25%. Ortega Decl. ¶ 9; Trescott

26  Aff., Ex. A, at 15; CVPIA s 3406(d)(4). Since the enactment of the CVPIA in 1992, refuges have never

received less than a 75%  allocation of Level 2 supplies from the CVP. Ortega Decl. ¶ 9.

**E.**     **Current Hydrologic Conditions & Reclamation's Actions.**

There is no dispute that California is in the midst of an historic, extreme drought. *See* Declaration of Ronald Milligan, Doc. 34-1, Ex. 1 at ¶ 6. In early May 2014, the California Department of Water Resources ("DWR") projected hydrologic conditions in both the Sacramento Valley and the San Joaquin Valley will be Critically Dry for Water Year 2014. *Id.* at ¶ 7. On January 17, 2014, the Governor of California issued a drought emergency proclamation, followed by a second proclamation on April 25, 2014. *Id.* at ¶ 7b. In light of the current conditions, the State Water Resources Control Board ("State Water Board" or "SWRCB") issued several Temporary Urgency Change Orders to the CVP and SWP ("the Projects"), temporarily modifying implementation of State Water Board Decision D-1641, which regulates salinity levels in the Delta by requiring minimum outflow requirements and regulating exports by the Projects. *Id.* at ¶ 8. Among other things, the State Water Board's Temporary Urgency Change Orders require the Projects to take measures to maintain upstream storage, including reducing Delta outflow requirements and reducing allowable exports. *Id.* Among other things, relevant federal and state agencies collaborated to develop the Central Valley Project and State Water Project Drought Operations Forecast ("Drought Operations Plan") in order to meet requirements placed on the Projects by the State Water Board and to meet requirements under the Endangered Species Act ("ESA"). *Id.* at ¶ 19. The CVP and SWP "operate in a coordinated manner" because it is "largely impractical to operate the Projects day to day, based on appropriative priority. *Id.* at ¶ 13. The current Coordinated Operations Agreement ("COA") between the CVP and SWP has been in place since 1986 and includes complicated accounting rules to ensure the projects meet water quality objectives, instream flow requirements, and other environmental responsibilities, as well as to apportion project yield. *Id.* at ¶ 14. Reclamation is required to operate the Project consistent with the COA. Pub. L. 99-546, 50 Stat 850; SWRCB Decisions D-1020, D-1275.

As part of the Drought Operations Plan and in order to maximize export capacity at the state and federal pumping facilities while minimizing impacts to the environment, Reclamation and DWR agreed

to shift most pumping operations to the federal Jones Pumping Plant and to account any water exported as CVP water. *Id.* at ¶ 21. Nothing in the Drought Operations Plain or the COA allows for the SWP to share 50/50 water that has been moved under CVP water rights to San Luis Reservoir. *Id.* at ¶¶ 14, 24.

In light of the constraints imposed by this year's conditions, Reclamation determined it cannot meet its obligations to the Exchange Contractors using only water from the Sacramento River and its tributaries and/or the Sacramento-San Joaquin Delta. *Id.* at ¶ 28. Thus, on May 15, Reclamation began releasing water from Millerton to meet the Exchange Contractors' demands. *Id.*

In February 2014 Reclamation announced a 40% allocation of Level 2 water supplies to refuges, and a 40% allocation of CVP water to the Exchange Contractors. *Id.* at ¶ 7b; Trescott Decl., Ex. C. In May 2014, Reclamation increased the allocation for both sets of contractors to 65%. This is in keeping with Reclamation's longstanding policy and practice of allocating the same percentage of water supplies to the Exchange Contractors and Refuge Contractors. Trescott Decl., Ex. C. 65% is the lowest allocation to both the Exchange Contractors and the Refuge Contractors on historical record. Ortega Decl. ¶ 9; Trescott Decl., Ex. C.

Low water allocations to other CVP contractors also make it highly unlikely that Incremental Level 4 water will be available for Reclamation to purchase this year. Ortega Decl. ¶ 11. The Exchange Contractors are typically the largest supplier of Incremental Level 4 water, but will not be transferring water to refuges this year. *Id.* In addition, only nominal local groundwater supplies are available to GWD, totaling only approximately 5 percent of its CVPIA water supply. *Id.*

## IV. DISCUSSION

**A.    Likelihood of Success on the Merits.**

### 1.    First Claim for Relief - For Adjudication of Contract Rights.

Plaintiffs' First Claim for Relief requests adjudication of rights under the contracts between Plaintiffs, Grassland, and the United States. Compl. at ¶¶ 76-83. This claim also asserts in passing that Reclamation's actions are "contrary to the rights of the Exchange Contracts." *Id.* at ¶ 82. However, Plaintiffs' contract claim points to no language in either the Grasslands Contract or the Exchange

Contracts for the Court to adjudicate. Instead, Plaintiffs allege that Reclamation's conduct violates Article 3(n) of the contracts between <u>Plaintiffs</u> and the United States, in which the United States agreed it would not "deliver to the Exchange Contractors thereunder waters of the San Joaquin River unless and until required by the terms of said contract" and further agreed that it would not

> "voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States under said exchange contract.

*Id.* at ¶ 79. This amounts to a direct suit against the United States on the theory that Reclamation violated Article 3(n) of Plaintiffs' contracts.[6]

### a.   Sovereign Immunity.

Before considering a claim as a basis for a finding of likelihood of success on the merits, the Court "must determine initially whether there is subject matter jurisdiction before it can proceed." *Friends of Panamit Valley v. Kempthorne*, 499 F. Supp. 2d 1165, 1176 (E.D. Cal. 2007). Federal Defendants, Grasslands, and San Luis argue that this Court does not have jurisdiction over Plaintiffs' contract claim because the United States has not waived its sovereign immunity. In the Complaint, Plaintiffs points to numerous sources of jurisdiction, but to only two that could even plausibly provide jurisdiction over the contract claim: the Little Tucker Act, 28 U.S.C. § 1346(a)(2); and the Reclamation Reform Act, 43 U.S.C. § 390uu . *See* Compl. at ¶¶ 38-39.

In pointing to these provisions as sources of waiver, it is possible that Plaintiffs are relying on *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir. 1993) (*Westlands I*), which rejected the proposition that the Little Tucker Act could provide direct jurisdiction over a breach of contract claim against Reclamation seeking injunctive relief, but held that in light of language in the Reclamation Reform Act, the Administrative Procedure Act ("APA") did provide a waiver of sovereign immunity for

---

[6] To the extent Plaintiffs seek to enforce the terms of contracts to which they are not party, Plaintiffs have failed to allege they are intended beneficiaries of those contracts. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F. 3d 1206, 1211 (9th Cir. 1999) ("Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary.").

such a claim:

A waiver of sovereign immunity must be unequivocally expressed in statutory text. *United States v. Idaho*, 508 U.S. 1, [6-7] (1993). Generally, contract claims seeking money damages can be brought against the United States, since the Tucker Act waives sovereign immunity on such claims. 28 U.S.C. §§ 1346(a)(2) [ ], 1491(a)(1) [ ]. However, the Tucker Act generally does not authorize injunctive or declaratory relief, as is requested here.[FN] *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir. [1985]) [ ]. Conversely, the APA generally waives sovereign immunity from nonmonetary claims against federal agencies. The APA authorizes a court to either compel or set aside agency action (i.e. to award equitable relief) but does not authorize money damages. 5 U.S.C. § 706.

> [FN - The Tucker Act does provide for nonmonetary relief by the Court of Claims in certain circumstances not present here. 28 U.S.C. §§ 1491(a)(2)–(3).]

The Bureau contends that a contract claim seeking equitable relief is still subject to the sovereign immunity defense. In *Block*, we held that a suit against the Government seeking equitable relief was partially barred. There, plaintiffs had sought equitable relief from certain timber cutting contracts with the United States. Plaintiffs asserted that performance of the contracts would violate a federal timber statute, and that performance was subject to certain common-law defenses such as impossibility of performance. We held that the claim based on an alleged statutory violation could proceed, but that the common-law claims founded purely on a contract could be brought under neither the Tucker Act nor the APA. *Block*, 753 F.2d at 1484–86.

In the absence of any other relevant statute, we might hold that sovereign immunity bars appellants' contract claims. However, § 221 of the Reclamation Reform Act of 1982 provides:

> Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances.

43 U.S.C. § 390uu. We conclude that this statutory provision waives sovereign immunity in this case, where appellants are seeking injunctive and declaratory relief under the *Westlands* and *San Benito* contracts. Accord *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F. Supp. 715, 748 (E.D. Cal. 1993) (holding that § 390 uu waives sovereign immunity from contract claims for injunctive relief and specific

performance).

*Id.* at 673-74 (footnote in original).

The analysis in *Westlands I* regarding the Little Tucker Act controls here. The Little Tucker Act gives district courts concurrent jurisdiction over claims against the United States based upon express or implied contracts seeking money damages not exceeding $10,000. 28 U.S.C. § 1346(a) (2). But, as to all other contract claims, 28 U.S.C. § 1491 gives the Court of Federal Claims exclusive jurisdiction to award money damages and "impliedly forbids declaratory and injunctive relief, [which likewise] precludes a § 702 waiver of sovereign immunity" for such claims. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998).[7] The Ninth Circuit has likewise extended this holding to the Little Tucker Act. *See N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993); *see also Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife*, 288 F.R.D. 500, 505 (D. Nev. 2013) (finding claims for declaratory and injunctive relief premised upon the Little Tucker Act are impliedly prohibited); *see also Gengler v. U.S. ex rel. its Dep't of Def. & Navy*, 453 F. Supp. 2d 1217, 1228 (E.D. Cal. 2006). This Court cannot exercise jurisdiction under the Little Tucker Act over Plaintiffs' contract claim for declaratory and injunctive relief.

*Westlands I* also contains language that might, at first glance, support Plaintiffs' suggestion that the Reclamation Reform Act, 43 U.S.C. § 390uu, provides a waiver of sovereign immunity. However, a subsequent Supreme Court decision, *Orff v. United States*, 545 U.S. 596 (2005), demonstrates that *Westlands I*'s holding concerning the Reclamation Reform Act is no longer valid. *Orff* clearly held that 42 U.S.C. § 390uu does not waive the United States' sovereign immunity to be "sued alone" in a contract dispute:

> Section 390uu grants consent "to join the United States as a necessary party defendant in any suit to adjudicate" certain rights under a federal reclamation contract. (Emphasis added.) This language is best interpreted to grant consent to join the United States in an action between other

---

[7] 28 U.S.C. § 1491(a)(2) provides that the Court of Federal Claims may, "incident of and collateral to any [ ] judgment [for contract damages], issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." Plaintiffs' prayers in this case do not appear to implicate any of these powers.

> parties-for example, two water districts, or a water district and its
> members-when the action requires construction of a reclamation contract
> and joinder of the United States is necessary. It does not permit a plaintiff
> to sue the United States alone.

*Id.* at 602; *see also Frenchman Cambridge Irr. Dist. v. Heineman*, 974 F. Supp. 2d 1264, 1281 (D. Neb. 2013) (district court jurisdiction under 43 U.S.C. § 390uu "foreclosed by the Supreme Court's holding that the statute waives immunity only in actions in which the United Sates is joined as a party, and not in direct actions against the United States"). This is precisely what Plaintiffs attempt to do here with their First Claim for Relief -- sue the United States directly for breach of contract. The Court lacks jurisdiction to adjudicate such a claim, so the claim cannot form the basis of a finding of likelihood of success on the merits.

### 2.   Second Claim for Relief - Violation of CVPIA/Res Judicata.

Plaintiffs' Second Claim for Relief alleges a "violation of the CVPIA/Res Judicata." Compl. at 25.

### a.   Applicable Standard of Review.

The only possible source of jurisdiction for Plaintiffs' CVPIA claim is the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*,[8] pursuant to which "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 701. Under the APA, a court applies a deferential arbitrary and capricious standard of review. *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917 (9th Cir. 2008). Under the APA, reviewing courts may reverse agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> [A] reviewing court [ ] "must consider whether the decision was based on
> a consideration of the relevant factors and whether there has been a clear
> error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

---

[8] The CVPIA does not provide for a private right of action. Therefore, claims alleging that a federal agency acted contrary to the CVPIA provisions must be brought under and are governed by the APA. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (applying APA to claim based upon the CVPIA).

U.S. 402, 416 (1971), abrogated in part on other grounds as recognized in
*Califano v. Sanders*, 430 U.S. 99, 105 (1977). Although our inquiry must
be thorough, the standard of review is highly deferential; the agency's
decision is "entitled to a presumption of regularity," and we may not
substitute our judgment for that of the agency. *Id*. at 415-16.

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).

### b.  **CVPIA.**

As to the asserted CVPIA violation, Plaintiffs acknowledge that the CVPIA directs the

Reclamation to enter into contracts to serve wildlife refuges, but assert that the refuges may receive

water only out of CVP "project yield." Compl. at ¶ 85. CVP "project yield" is defined as follows:

> For the purpose of this section, the term "Central Valley Project yield"
> means the delivery capability of the Central Valley Project during the
> 1928-1934 drought period after fishery, water quality, and other flow and
> operational requirements imposed by terms and conditions existing in
> licenses, permits, and other agreements pertaining to the Central Valley
> Project under applicable State or Federal law existing at the time of
> enactment of this title have been met.

CVPIA § 3406(b)(2). Plaintiffs appear to assert that, in light of this definition, Reclamation cannot

deliver water to the wildlife refuges until the Exchange Contractors' rights are satisfied. *See* Compl. at

¶¶ 85-86.

No matter how the definition of "project yield" is interpreted, Plaintiffs' claim fails because the

section of the CVPIA that concerns provision of water to the wildlife refuges, CVPIA § 3406(d),

nowhere indicates that the refuges may receive water only out of CVP project yield. The first paragraph

of CVPIA § 3406(d) provides:

> Central Valley Refuges and Wildlife Habitat Areas.--In support of the
> objectives of the Central Valley Habitat Joint Venture and in furtherance
> of the purposes of this title, the Secretary shall provide, either directly or
> through contractual agreements with other appropriate parties, firm water
> supplies of suitable quality to maintain and improve wetland habitat areas
> on units of the National Wildlife Refuge System in the Central Valley of
> California; on the Gray Lodge, Los Banos, Volta, North Grasslands, and
> Mendota state wildlife management areas; and on the Grasslands
> Resources Conservation District in the Central Valley of California.

The "firm" water supplies refer to Level 2 supplies as described in CVPIA § 3406(d)(1), which

provides:

(1) Upon enactment of this title, the quantity and delivery schedules of water measured at the boundaries of each wetland habitat area described in this paragraph shall be in accordance with Level 2 of the "Dependable Water Supply Needs" table for those habitat areas as set forth in the Refuge Water Supply Report and two-thirds of the water supply needed for full habitat development for those habitat areas identified in the San Joaquin Basin Action Plan/Kesterson Mitigation Action Plan Report prepared by the Bureau of Reclamation. Such water shall be provided through long-term contractual agreements with appropriate parties and shall be supplemented by the increment of water provided for in paragraph (1) of this subsection; Provided, That the Secretary shall be obligated to provide such water whether or not such long-term contractual agreements are in effect. In implementing this paragraph, the Secretary shall endeavor to diversify sources of supply in order to minimize possible adverse effects upon Central Valley Project contractors.

CVPIA § 3406(d)(1) (emphasis added). Although Reclamation is directed to enter into contractual agreements for the supply of this "firm" water to the refuges, Reclamation is obligated to provide this firm water whether or not such contracts are in effect.

CVPIA § 3406(d)(2) directs Reclamation to secure supplemental water for the refuges, also known as "Level 4" water:

Not later than ten years after enactment of this title, the quantity and delivery schedules of water measured at the boundaries of each wetland habitat area described in this paragraph shall be in accordance with Level 4 of the "Dependable Water Supply Needs" table for those habitat areas as set forth in the Refuge Water Supply Report and the full water supply needed for full habitat development for those habitat areas identified in the San Joaquin Basin Action Plan/Kesterson Mitigation Action Plan Report prepared by the Bureau of Reclamation. The quantities of water required to supplement the quantities provided under paragraph (1) of this subsection shall be acquired by the Secretary in cooperation with the State of California and in consultation with the Central Valley Habitat Joint Venture and other interests in cumulating increments of not less than ten percent per annum through voluntary measures which include water conservation, conjunctive use, purchase, lease, donations, or similar activities, or a combination of such activities which do not require involuntary reallocations of project yield.

(Emphasis added.) It is only this supplemental "Level 4" water that must be acquired by Reclamation in a manner that does "not require involuntary reallocations of project yield."

In the present case, only Level 2, not supplemental Level 4 water, is at issue. In fact, in times of shortage, CVPIA § 3406(d)(4) provides that Reclamation may temporarily reduce even Level 2

deliveries by up to 25%. Reclamation has invoked this provision (and, apparently, then some) this year to reduce refuge Level 2 supplies to 65%. Plaintiffs' contention that deliveries this year are limited to available water after the Exchange Contractors' needs are satisfied is wholly without merit.

### c.   Res Judicata.

Plaintiffs also reference the concept of *res judicata* in their Complaint, presumably in reference to decisions in the *Westlands* cases. Compl. at 25 & ¶ 87. The Court has thoroughly examined the extensive prior decisions issued by District Judge Oliver W. Wanger and the Ninth Circuit in those cases and finds no merit to Plaintiffs' assertion of *res judicata*. Generally, the *Westlands* cases addressed Westlands Water District's and San Benito Water District's allegations that they held a superior right to water stored in San Luis Reservoir, that Reclamation acted unlawfully by allocating water from San Luis Reservoir to the Exchange Contractors before first satisfying the needs of Westlands and San Benito, and that Reclamation must apportion water equally among all recipients of water from San Luis Reservoir, including the Exchange Contractors. *See Westlands I*, 10 F.3d at 670-73, 674-77; *Westlands VI*, 153 F. Supp. 2d at 1138; *Westlands VII*, 337 F.3d at 1100-04. There can be no dispute that the *Westlands* decisions did establish certain principles that are relevant to the present action, *e.g.*, that the Exchange Contractors hold a priority right to CVP water. It is also true that the *Westlands* decisions discussed Plaintiffs' contract rights, but only insofar as the terms of Plaintiffs' contracts served to undermine Westlands' and San Benito's arguments that Millerton was a readily available source of supply to satisfy the Exchange Contractors' demands. *Westlands III* held that the United States' agreement in the Friant Contracts not to "voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors ... from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta" undermined Westlands' and San Benito's demands that Reclamation apportion water from San Luis Reservoir. *Westlands III*, 864 F. Supp. at 1547-48. However, the *Westlands* decisions never broached the specific questions raised here concerning Reclamation's obligations to deliver water to the wildlife refuges and how those obligations might impact Reclamation's ability to deliver replacement water to the Exchange Contractors.

Accordingly, none of the *Westlands* decisions operate as *res judicata* in the present matter, as *res judicata* requires, among other things, complete identity of the issue or claim. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) (*res judicata* serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.").

### d.   Legislative History.

The Court is likewise unconvinced by Plaintiffs' citation to a statement made by Senator Wallop during a Congressional discussion prior to the enactment of the CVPIA, which was referenced by the district court in *Westlands Water Dist. v. Patterson,* 900 F. Supp. 1304 (1995) ("*Westlands IV*"):

> A very significant change is how dry year shortages are dealt with. The House had suggested that the 800,000 acre-feet and the wildlife refuge water be subject to reduction only when shortages are imposed on prior right and exchange right holders. Aside from the implicit taking, since those rights are secured under State law and are superior to any CVP right, that provision would have never worked in practice.
>
> During the current drought, prior right and exchange right holders agreed to forgo certain deliveries in order to permit the Secretary to make deliveries to the wildlife refuges and to urban users. No reductions were imposed on them since no reductions could be imposed so long as there was any water.

138 Cong. Rec. S17658, 17660 (Sept. 30, 1992) (statement of Sen. Wallop). In this statement, Senator Wallop opined why a prior draft of the CVPIA, which would have triggered the 25% reduction in refuge water supplies only after the Exchange Contractors received reductions, was better worded in the final version of the CVPIA, which triggers the 25% reduction based upon reductions imposed upon any agricultural deliveries of CVP water. In *Westlands VI*, the district court cited this statement to support the proposition that Congress acknowledged the superior rights of the Exchange Contractors. 900 F. Supp. at 1320. But this statement is not dispositive of any issue presently before this Court. No party disputes that the Exchange Contractors' rights must be honored. The question here is whether the Level 2 refuge water may be supplied from sources that might otherwise be used to provide "replacement water" to the Exchange Contractors, which in turn has required the release of water from Millerton to

fulfill the Exchange Contractors' demands. The Court agrees with Grasslands' argument that the key fact here is that the version of the CVPIA that was ultimately adopted requires Reclamation to provide Level 2 refuge water as a "firm" supply, with no more than a 25% reduction in years when agricultural users receive an equal or greater reduction. Senator Wallop's comment does not address the question of whether Reclamation has discretion to supply the refuges with water from sources that might otherwise be used to supply replacement water to the Exchange Contractors.

### 3. Third Claim for Relief -- Violation of the 1902 Reclamation Act; Unlawful Relinquishment of Rights to Water to Benefit State Water Project.

Section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, "requires Reclamation to comply with state law in acquiring water rights for the diversion and storage of water by the CVP." *Westlands VII*, 337 F.3d at 1101. Plaintiffs' Third Claim for Relief alleges:

> 92. This year, the water delivered to San Luis Reservoir was "natural and abandoned flows" of the Delta. The Bureau of Reclamation holds the senior right to this water; the State's right to take water from the Delta are junior to the Bureau's rights. Despite its senior rights, the Bureau of Reclamation decided this year to relinquish its senior rights and to split Delta water in the San Luis Reservoir 50-50 with the State Water Project.

> 93. The Bureau of Reclamation has violated California Civil Code Section 1414, and therefore Section 8 of the 1902 Reclamation Act, by agreeing to split the Delta water in the San Luis Reservoir with the State Water Project. ***

Compl. at ¶¶ 92-93.

### a. Failure to Join California Department of Water Resources.

The proposed TRO seeks to enjoin Reclamation from, among other things, "deviating from the prior appropriation doctrine by allocating water to junior appropriators, including the State Water Project [("SWP")] Contractors, and wildlife refuges, ahead of providing the substitute water supply to the Exchange Contractors." The SWP is operated by the DWR. Yet, DWR has not been joined as a necessary party defendant.

Federal Rule of Civil Procedure 19, which governs the circumstances under which persons must be joined as parties to a lawsuit, provides in relevant part:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

* * *

(b) When Joinder Is Not Feasible.

If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

The district court in *Natural Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155 (E.D. Cal. 2008), succinctly summarized the relevant standard:

22

The "[a]pplication of Rule 19 involves three successive inquiries." *Wilbur [v. Locke]*, 423 F.3d [1101,] 1111 [(9th Cir.2005) abrogated on other grounds, *Levin v. Commerce Energy, Inc*., 560 U.S. 413 (2010)]. "First, the court must determine whether a nonparty should be joined under Rule 19(a)." The term "necessary" is used to describe those persons to be joined if feasible. *Id*. at 1112. "The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992). "If an absentee is a necessary party under Rule 19(a), the second stage is for the court to determine whether it is feasible to order that the absentee be joined." *Wilbur*, 423 F.3d at 1112. "Finally, if joinder is not feasible, the court must determine at the third stage whether the case can proceed without the absentee, or whether the absentee is an 'indispensable party' such that the action must be dismissed." *Id*.; *Shermoen* 982 F.2d at 1317 (a court must determine whether the absent party is "indispensable" "so that in 'equity and good conscience' the suit should be dismissed.").

*Id*. at 1182-83.

The first inquiry is whether DWR is a "necessary" party to this lawsuit. Rule 19(a)(1) provides two alternative pathways to a finding of necessity. Here, the most obviously relevant provision is rule Rule 19(a)(1)(B), which provides that a party may be necessary if it "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the [party's] ability to protect that interest." "Impairment may be minimized if the absent party is adequately represented in the suit." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). There is no question that DWR has a legally protected interest in this suit. It is party to agreements with Reclamation that may be significantly impaired if injunctive relief is granted. *See NRDC,* 539 F. Supp. 2d at 1186 ("[I]f two parties enter into a contract, and a third party sues one of the contracting parties to enjoin that contracting party from performing under its contract, the presence of the other party to the contract is required in the lawsuit.").

The question then becomes whether DWR is adequately represented so as to minimize any impairment of their legal interests. "In assessing an absent party's necessity under [Rule] 19(a), the question whether that party is adequately represented parallels the question whether a party's interests are so inadequately represented by existing parties as to permit intervention of right under [Rule] 24(a)." *Shermoen*, 982 F.2d at 1318. "The requirement of [Rule 24(a)] is satisfied if the applicant shows that

23

representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n. 10 (1972). The Ninth Circuit uses the following three-step inquiry to determine if a non-party is adequately represented by existing parties:

> A non-party is adequately represented by existing parties if: (1) the interests of the existing parties are such that they would undoubtedly make all of the non-party's arguments; (2) the existing parties are capable of and willing to make such arguments; and (3) the non-party would offer no necessary element to the proceeding that existing parties would neglect.

*Southwest Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1153-54 (9th Cir. 1998).

Here, no existing party adequately represents the interests DWR. Federal Defendants represent the United States' broad interests in operating the CVP, interests which are not always aligned with DWR's interests in operating the SWP. *See, e.g.*, *Natural Res. Def. Council v. Norton*, 2006 WL 39094 *9 (E.D. Cal. Jan. 5, 2006) (discussing intervention of DWR in a related case concerning the CVP and SWP). Nor can it reasonably be maintained that Grasslands represents DWR's interests in securing a water supply for SWP contractors. DWR is therefore a necessary party.

Having found DWR a necessary party, the next question is whether DWR can be joined. The answer is unequivocally no. DWR, as an agency of the State of California, is protected by sovereign immunity. *See Puerto Rico Aqueduct and Sewer Auth. V Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("Absent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court.") (internal citation and quotation omitted). Accordingly, neither agency can be sued in federal court unless: (1) Congress has expressly abrogated California's Eleventh Amendment immunity in a relevant federal statute; or (2) California has unambiguously and unequivocally waived its Eleventh Amendment immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).

Finally, the Court must determine whether "in equity and good conscience," the claims that might implicate DWR's interests can proceed in the absence of DWR, or, alternatively, should be dismissed. Fed. R. Civ. P. 19(b). The Court must consider the following factors:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

    (A) protective provisions in the judgment;

    (B) shaping the relief; or

    (C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id*. As to the first factor, there is no question that DWR would be prejudiced issuance of a judgment in favor of Plaintiffs on the claim that the Reclamation is acting unlawfully by delivering water to SWP contractors. As to the second factor, the Court cannot imagine a way to grant Plaintiffs the relief they request in any manner that would lessen or avoid that prejudice. The Court cannot definitively rule on the third factor, but, given the complex interactions between the CVP and SWP, the practical impact of any judgment concerning operation of integrated aspect of the Projects that did not bind DWR would, at best, be difficult to predict. Finally, the Court acknowledges that a finding of indispensability may leave Plaintiffs without a forum for resolution of their claims concerning delivery of water by Reclamation to SWP contractors. However, "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims. But that result is contemplated under the doctrine of foreign sovereign immunity." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 872 (2008).

Accordingly, DWR is an indispensable party in connection with any of Plaintiffs' claims that allege Reclamation is unlawfully delivering water to SWP contractors. This is the focus of Plaintiffs' Third Claim for Relief, which therefore cannot form the basis of a finding of likelihood of success on the merits.

*//*

**b.      Merits.**

Even if there were no joinder defect, the Court has serious doubts as to the merit of this claim. First, the claim depends on the factual premise that "the Bureau of Reclamation decided this year to relinquish its senior rights and to split Delta water in the San Luis Reservoir 50-50 with the State Water Project." According to the Declaration of Ronald Milligan, the Manager of Reclamation's Central Valley Operations Office, Reclamation engages in no such "sharing" *See* Milligan Decl., Doc. 34-1, at ¶¶ 1, 12a, 14, 22, 24. As Federal Defendants' concisely explain in their opposition brief, the SWP and CVP do coordinate operations:

> The construction of State Water Project facilities in the Delta and in the San Joaquin Valley, virtually side-by-side with CVP facilities, presented enormous challenges to how the two projects would operate, both in appropriating natural flow when such flow is present in the Delta (often called "when excess conditions exist") and with respect to each project's export of water that has been released from storage. To resolve disputes over the water rights each project holds from the State, Reclamation and DWR negotiated a Coordinated Operating Agreement ("COA") in 1986. The COA provides for coordinated operations in the Delta and a system for accounting for water exports by each project. This agreement was authorized and approved by Congress in 1986. PL 99–546, 1986 HR 3113. Congress again approved of the COA in the CVPIA, by authorizing and directing the Secretary to "fully comply with the United States' obligations" set forth in the COA "in the implementation of the provisions of this title." CVPIA § 8411(b).
>
> Essentially, the purpose of the COA is to ensure that each Project retains its share of water and bears its share of the burden for Sacramento Valley inbasin uses, including legal users of water below upstream Project reservoirs, and flow-dependent regulatory requirements, like salinity control and minimum Delta outflow. The COA quantifies annual supplies available for both Projects and describes how the Projects will be operated in a coordinated manner. Because the Projects both use the Sacramento River for conveyance, accounting procedures are necessary to determine how the commingled water is operated, especially once the water enters the Delta. Without accounting, it would be difficult to determine whether the water in the Delta is stored water or, natural flow or abandoned water. COA accounting occurs on a daily basis and determines when exports are exporting natural flow or stored water. "Balanced water conditions" exist when storage releases, plus unregulated flow equal Sacramento in-basin uses, plus exports. COA, Art. 3(b). "Excess water conditions" are periods when it is agreed that releases from upstream reservoirs plus unregulated flow exceed Sacramento Valley in-basin uses, plus exports. COA, Art. 3(c). During balanced conditions, the projects share Sacramento in-basin use demands 75% CVP, and 25% State Water Project. COA, Art. 6(c).

> Also during balanced conditions, the Project share available export water 55% CVP and 45% SWP. COA, Art. 6(d). During excess conditions, each party "has the responsibility to export and store as much water as possible within its physical and contractual limits." COA, Art. 6(g). All of Reclamations actions pursuant to the Drought Operations Plan comply with the COA. Milligan Decl. at ¶ 22.
>
> Moreover, water that is exported by either project south of the Delta may be stored in San Luis Reservoir near Los Banos, a joint use facility that is owned by the United States and jointly operated by the United States and the State of California. The use of Delta pumping capacity to export water south of the Delta is constantly changing and, depending on hydrologic conditions, the time of year, and biological considerations, may involve water released from storage which is protected under a project's water right, or natural flow in the Delta when excess conditions exist.

Doc. 34 at 14. Plaintiffs do not allege that operations pursuant to the COA are unlawful and they fail to provide any evidence that Reclamation's actions have departed from the COA's terms. Plaintiffs offer no evidence (or even allegations beyond conclusory assertions) of a 50/50 sharing arrangement between the CVP and the SWP, so their Third Claim for Relief cannot support a finding of likelihood of success on the merits.

The Court acknowledges that Plaintiffs have submitted significant evidence of the irreparable harm they will face as a result of reduced water deliveries resulting from Reclamation's actions. *See generally* Docs. 5-14. At the same time, Grasslands has submitted equally significant evidence of the harm to wildlife that would occur if deliveries to the wildlife refuges were curtailed. *See* Ortega Decl. The Court declines to discuss the parties' competing presentations in detail because, without any likelihood of success on any claim advanced by Plaintiffs as a basis for their TRO, their motion must be denied, regardless of the harm they may face. Even under the Ninth Circuit's sliding scale approach to injunctive relief, movant must still demonstrate at least "serious questions" going to the merits. *Alliance* 632 F.3d at 1131. "Serious questions" are those that are "substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Marcos*, 862 F.2d at 1362. Movants must demonstrate a "fair chance of success on the merits." *Id.* Movants have failed to do so here.

//

27

**V. <u>CONCLUSION AND ORDER</u>**

For the reasons set forth above, Plaintiffs' motion for a temporary restraining order is DENIED. Contrary to the popular synopsis that this case is about overzealous government regulators prioritizing the needs of fish and wildlife over farmers and the economy, this decision is a direct result of the law as Congress has chosen to write it. It is the duty of the Court to uphold the law, regardless of the presence or absence of popularity.

**SO ORDERED**
**Dated: May 27, 2014**

<u>**/s/ Lawrence J. O'Neill**</u>
**United States District Judge**