**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRIANT WATER AUTHORITY, *et al.*, | Case No. 1:14-CV-000765-LJO-BAM |
| Plaintiffs, | **MEMORANDUM DECISION AND** |
| v. | **ORDER RE PLAINTIFFS'** |
| | **MOTION TO TRANSFER TO** |
| SALLY JEWELL, as Secretary of the UNITED | **COURT OF FEDERAL CLAIMS** |
| STATES DEPARTMENT OF THE INTERIOR, *et* | **(Doc. 71)** |
| *al.*, | |
| Defendants, | |
| SAN JOAQUIN RIVER EXCHANGE | |
| CONTRACTORS WATER AUTHORITY, *et al.*, | |
| Intervenors, | |
| SAN LUIS & DELTA-MENDOTA WATER | |
| AUTHORITY, *et al.*, | |
| Defendant-Intervenors. | |

## I. INTRODUCTION

Plaintiff Friant Water Authority ("Friant"), a California joint powers authority that consists of twenty-one member water, water conservation, water storage and irrigation districts, as well as the City of Fresno, all located on the east side of the southern San Joaquin Valley, in Central California. Friant and its member agencies[1] (collectively, "Plaintiffs") bring this lawsuit against the United States Department of the Interior ("Interior"), Interior's member agency, the United States Bureau of

---

[1] The member agencies are: Arvin-Edison Water Storage District, Delano-Earlimart Irrigation District, Exeter Irrigation District, City of Fresno, Fresno Irrigation District, Ivanhoe Irrigation District, Kaweah Delta Water Conservation District, Kern-Tulare Water District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Madera Irrigation District, Orange Cove Irrigation District, Pixley Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Stone Corral Irrigation District, Tea Pot Dome Water District, Terra Bella Irrigation District, and Tulare Irrigation District. Doc. 64 at 1 & ¶¶ 12-28.

1

Reclamation ("Reclamation" or "the Bureau"), as well as various federal officers[2] (collectively, "Federal Defendants"). *See generally* Doc. 64, Corrected First Amended Complaint ("FAC").

Friant's members contract with Reclamation for the delivery of water from the Friant Unit of the Central Valley Project ("CVP"). One of the principal features of the Friant Unit is Friant Dam, located in the foothills northeast of the City of Fresno, which impounds the waters of the upper San Joaquin River in Millerton Lake. The FAC challenges Federal Defendants' decision to release water from Millerton to satisfy the demands of downstream "Exchange Contractors." The Exchange Contractors hold priority "Exchange Contracts" with Reclamation, reflecting the fact that the Exchange Contractors held rights to the waters of the San Joaquin River that pre-date Reclamation's construction of the Friant Unit. *See* FAC ¶ 51.

Reclamation normally satisfies the demands of the Exchange Contractors by providing them with "substitute water" transported from Northern California through facilities in the Sacramento-San Joaquin Delta, thereby freeing up much of the water stored at Millerton for use by Friant's members. See *id*. at ¶¶ 7, 54. In the spring of 2014, however, Reclamation began releasing water from Millerton to satisfy the Exchange Contractors' demands. *Id*. at ¶ 8. According to Plaintiffs, Reclamation did so because it decided to allocate some of the water that normally would serve as "substitute water" to wildlife refuges, including those refuges administered by Grassland Resource Conservation District and Grassland Water District ("Grasslands"). *See id*. at ¶ 95. As a result, Reclamation allocated no water to Plaintiffs in 2014. *Id*. at ¶ 9. The FAC alleges generally that Reclamation's actions constitute a breach of the United States' contracts with Friant's member agencies, which contracts prohibit Reclamation from voluntarily declaring itself unable to supply the Exchange Contractors with substitute water. *Id*. at ¶¶ 99-107. The FAC also alleges that Federal Defendants' actions constituted a taking without just compensation in violation of the Fifth Amendment to the U.S. Constitution. *Id*. at ¶¶ 108-112.

---

[2] The Complaint also names Sally Jewell, Secretary of the United States Department of the Interior; Lowell Pimley, Acting Commissioner of the Bureau; David Murillo, Regional Director of the Bureau; and Michael Jackson, Area Manager of the South-Central California Area Office of the Bureau. Doc. 64.

Before the Court for decision is Plaintiffs' motion to change venue by way of transfer to the Court of Federal Claims. Doc. 71. Federal Defendants[3]; San Luis & Delta Mendota Water Authority ("San Luis")[4]; and Grasslands[5] filed oppositions. Docs. 89, 90 & 92. Plaintiffs replied. Doc. 95. The matter was taken under submission on the papers pursuant to Local Rule 230(g). Doc. 96.

## II. BACKGROUND

**A.   The CVP.**

In *Westlands Water District v. United States*, 337 F.3d 1092 (*Westlands VII*)[6], the Ninth Circuit succinctly summarized the history of relevant aspects of the CVP:

> **A. Central Valley Project**
>
> The Central Valley Project ("CVP") is "the largest federal water management project in the United States." *Central Delta Water Agency v. United States*, 306 F.3d 938, 943 (9th Cir. 2002). "[L]ocated in the Central Valley Basin of California, which is roughly 400 miles long by 120 miles wide, [it] includes the major watersheds of the Sacramento and San Joaquin river systems." *Id.* These two river valleys merge at the Sacramento San Joaquin Delta, where the waters mix and then flow through the Carquinez Strait into the San Francisco Bay, continuing to the Pacific Ocean. *Id.*; *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 728 (1950). The Sacramento River has almost twice as much water as the San Joaquin River but the Sacramento Valley has very little tillable soil,

---

[3] Federal Defendants initially indicated that they would not oppose the motion to transfer, provided the Exchange Contractors' complaint-in-intervention was voluntarily dismissed. Doc. 71 at 2, 7; Doc. 92 at 2 n.2. Grasslands' intervention was premised in part upon Federal Defendants' apparent lack of intent to oppose the motion to transfer. "Upon further consideration and analysis," however, Federal Defendants "concluded that because the transfer rests on questions of [] jurisdiction, which [] consent cannot supply... the better course was to present the jurisdictional concerns to the Court." Doc. 92 at 2. n.2. Should this Court determine it lacks jurisdiction over the claims presented, Federal Defendants do maintain transfer to the Court of Federal Claims would be appropriate. *Id.*
  Friant argues that the Court should consider "expressly ignoring the federal brief as a means of policing proper litigation conduct, particularly since the Court allowed Grasslands to intervene to make the same argument." Doc. 95 at 1. Friant offers no authority to support striking Federal Defendants' brief on this ground. Federal Defendants have offered an explanation for their change in strategy. The brief will be considered. However, Federal Defendants' unexpected participation does create a record that is replete with repetition. The three opposition briefs overlap extensively. In the future, Federal Defendants shall meet and confer with Defendant Intervenors to avoid as much as practicable such repetition.
[4] San Luis was permitted to intervene on May 27, 2014. Doc. 43.
[5] Grasslands was permitted to intervene for the limited purpose of opposing the present motion to change venue/transfer. Doc. 88.
[6] *Westlands VII* is the culmination of a series of decisions that may be referenced as follows to keep numbering consistent with the scheme set forth in *Westlands VII*: *Westlands Water Dist. v. U.S. Dept. of Interior*, 805 F. Supp. 1503 (E.D. Cal. 1992) ("*Westlands 0*"); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir. 1993) ("*Westlands I*"); *Westlands Water Dist. v. United States*, 850 F. Supp. 1388 (E.D. Cal. 1994) ("*Westlands II*"); *Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536 (E.D. Cal. 1994) ("*Westlands III*"); *Westlands Water Dist. v. Patterson*, 900 F. Supp. 1304 (E.D. Cal. 1995) ("*Westlands IV*"); *Westlands Water Dist. v. United States*, 100 F.3d 94 (9th Cir. 1996) ("*Westlands V*"); *Westlands Water Dist. v. United States*, 153 F. Supp. 2d 1133 (E.D. Cal. 2001) ("*Westlands VI*"); *Westlands Water Dist. v. United States*, 337 F.3d 1092 (9th Cir. 2003) ("*Westlands VII*").

3

while about "three-fifths of the [San Joaquin] valley lies in the domain of the less affluent San Joaquin." *Gerlach Live Stock*, 339 U.S. at 728; *see also Dugan v. Rank*, 372 U.S. 609, 612 (1963). To alter this imbalance and to make water available to the San Joaquin Valley, the state of California embarked on re-engineering its natural water distribution through the authorization of the Central Valley Project ("CVP"). [The] United States took over administration of this project in 1935. *Gerlach Live Stock*, 339 U.S. at 728.

The CVP's purpose is to "improv[e] navigation, regulat[e] the flow of the San Joaquin River and the Sacramento River, control[ ] floods, provid[e] for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy." Act of August 26, 1937, Pub. L. No. 75 392, 50 Stat. 844, 850. To accomplish the project's purposes, CVP's construction includes a series of many dams, reservoirs, hydropower generating stations, canals, electrical transmission lines, and other infrastructure. *Gerlach Live Stock*, 339 U.S. at 733.

The [Bureau] operates the CVP. The California State Water Resources Control Board grants permits for water appropriation from the CVP. The Bureau appropriates water from various sources and delivers it to permit holders for beneficial uses. *Central Delta Water*, 306 F.3d at 943.

**1. San Luis Unit of the CVP**

The San Luis Unit, one of the many water management units of the CVP, was authorized by the San Luis Act of 1960. Pub. L. No. 86-488, 74 Stat. 156 (June 3, 1960). The San Luis Unit, an integral part of the CVP, consists of the San Luis Dam and the San Luis Reservoir. The San Luis Reservoir was constructed to provide water to Merced, Fresno and King Counties, and is used to store surplus water from the Sacramento-San Joaquin Delta, for delivery to contractors such as Westlands and San Benito. The Tracy Pumping Plant pumps water from the Sacramento-San Joaquin Delta into the Delta-Mendota Canal. The Delta–Mendota Canal, located south of the Sacramento-San Joaquin Delta, channels water along the west side of the San Joaquin Valley for use in the San Luis Unit and Reservoir. *Westlands Water Dist. v. Patterson*, 864 F. Supp. 1536, 1539 (E.D. Cal. 1994) (*Westlands III* ).

**2. Friant Unit of the CVP**

Around 1939, the Bureau took over construction of a dam on the San Joaquin River that eventually created Lake Millerton and the Friant Unit of the Central Valley Project. *See Gerlach Live Stock Co*., 339 U.S. at 728–29; *Westlands III*, 864 F. Supp. at 1539. The Friant Unit impounds the waters of the San Joaquin River at a dam constructed at Friant, California, approximately sixty miles upstream from Mendota, diverting a major portion of the flow of the San Joaquin River both to storage in Millerton Lake and into the Friant–Kern and Madera Canals for delivery

to local water users. *Dugan*, 372 U.S. at 612-13. The CVP also diverts water from the Sacramento River into the San Joaquin Valley to make additional water available for use in the San Joaquin Valley.

**B. Exchange Contractors**

To fulfill the purposes of the Rivers and Harbors Act of 1937, the Secretary of the Interior was given the right to acquire water rights for the development of the CVP. Act of August 26, 1937, Pub. L. No. 75-392, 50 Stat. 844, 850. The Exchange Contractors hold both pre-1914 riparian and appropriative rights to the San Joaquin River. Cal. State Water Rights Bd. Dec. D-935, 80 (1959). [T]he cooperation of the Exchange Contractors made possible the expansion of the CVP and the San Luis Unit. *Westlands Water Dist. v. United States*, 153 F. Supp.2d 1133, 1146-47 (E.D. Cal. 2001) (*Westlands VI*). To provide a reliable source of water for its proposed canals, the Bureau had to assure that the Exchange Contractors' pre-existing rights would be satisfied. *Westlands III*, 864 F. Supp. at 1539.

In 1939, the Exchange Contractors entered into two contracts with the United States: a Purchase Contract and an Exchange Contract. "Under the Purchase Contract, the Exchange Contractors sold all [of] their San Joaquin River water rights to the United States, except for 'reserved water,' water to which the Exchange Contractors [hold ] vested rights. Simultaneously, under the Exchange Contract, the Exchange Contractors agreed not to exercise their [reserved water] rights" to the San Joaquin River, so long as they receive certain volumes of substitute water. *Id.*

Pursuant to the Exchange Contract, the exchange of water is a conditional permanent substitution of water supply. The United States has a right to use the Exchange Contractors' water rights "so long as, and only so long as, the United States does deliver to the Contracting Entities by means of the Project or otherwise substitute water in conformity with this contract." The Exchange Contract defines "substitute water" as "all water delivered ... regardless of source." The contract further provides that "[i]t is anticipated that most if not all of the substitute water provided the [Exchange Contractors ] hereunder will be delivered to them via the [ ] Delta-Mendota Canal."

Water allocation in any year is designated as a full year supply of 100 percent. In critical years, the water supply can be reduced by approximately twenty-five percent. If there exists a temporary interruption of waters from the Delta-Mendota Canal, the [Exchange] contract provides that the United States will deliver water stored in Millerton Lake behind the Friant Dam.

*Westlands VII*, 337 F.3d at 1095-97 (footnotes omitted).

**B.    Plaintiffs' Contracts.**

When the San Luis Unit was added to the CVP, water districts that received water from the

Friant Division were concerned that addition of the San Luis Unit, which provides water to various water districts on the west side of the San Joaquin Valley, "could reduce availability of Sacramento River and Delta water, which would require the Exchange Contractors to exercise their San Joaquin River water rights in future times of shortage, which in turn would reduce" water available to the Friant Unit contractors. *Westlands VI*, 153 F. Supp. 2d at 1156. *Westlands VI* discussed a December 29, 1959, letter, in which H.P. Dugan, Director of Region 2 of the Bureau of Reclamation, wrote:

> I confirm to you that it has been, is, and will continue to be the policy and practice of the United States to utilize the water available to it or made available to it [from] ... the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta to first satisfy the requirements of the Exchange Contract and Schedule 2 of the Purchase Contract so long as it is legally and reasonably physically possible for it to satisfy these requirements.

*Id*. at 1155-56 (internal citation omitted).

Friant water users requested their existing contracts be amended to require the United States to do everything to ensure that the Exchange Contractors receive their full allocation of substitute water, thereby preventing the Exchange Contractors from exercising their San Joaquin River water rights to the detriment of those water-districts. *Id*. at 1156. Eventually, all of Plaintiffs' contracts with Reclamation were amended to provide:

> The United States agrees that it will not deliver to the Exchange Contractors thereunder waters of the San Joaquin River unless and until required by the terms of said contract, and the United States further agrees that it will not voluntarily and knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water that is available or that may become available to it from the Sacramento River and its tributaries or the Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States under said Exchange Contract.

FAC ¶ 59 & Ex. 1, art. 3(n) (2010 contract between the United States and Orange Cove Irrigation District).

## C.    Wildlife Refuge Water Supply.

Section 3406(d)(1) of the Central Valley Project Improvement Act ("CVPIA"), Pub. L. No. 102–575, 106 Stat. 4600 (1992), requires the Secretary of the Interior ("Secretary") to provide water to

6

certain wildlife refuges in accordance with "Level 2 of the 'Dependable Water Supply Needs' table for those habitat areas as set forth in the Refuge Water Supply Report...,' a measure of water equal to historical water deliveries to the refuges between 1978 and 1984." FAC ¶ 64; CVPIA § 3406(d)(1). Section 3406(d)(2) authorizes the Secretary to take voluntary measures to provide an additional increment of water, called "Level 4," needed to fully develop the refuges. FAC ¶ 64; CVPIA § 3406(d)(2). The Grasslands parties receive water pursuant to CVPIA § 3406(d).

**D.      Reclamation's Actions in 2014.**

In 2014, for the first time, Reclamation claimed it was unable to deliver substitute water to the Exchange Contractors. FAC ¶ 90. In April 2014, Reclamation announced it would provide the Exchange Contractors with 40% of the substitute water owed them under the Exchange Contract. *Id*. at ¶ 92(A). This allocation of substitute water was later increased to 75% in October, the timing of which resulted in an overall 65% allocation of substitute water. *Id*. To fulfill its contractual obligations to the Exchange Contractors, Reclamation released San Joaquin water from Friant Dam to the Exchange Contractors. *See id.* at ¶ 90. This decision deprived Plaintiffs of nearly all their CVP water supply. *Id*.

At the same time, Reclamation also announced in April 2014 that it would provide wildlife refuge areas with 40% of their Level 2 allocations. *Id*. at ¶ 92(C). Reclamation later increased this allocation to 65%. *Id*.

**E.      Procedural History.**

Plaintiffs' original complaint, filed May 20, 2014 against Federal Defendants and Grasslands, alleged Federal Defendants' conduct violated various provisions of federal law and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and requested adjudication of rights under the contracts between Plaintiffs, Grasslands, and Federal Defendants. Doc. 1. Also on May 20, 2014, Plaintiffs filed a motion for a temporary restraining order ("TRO") that would have, among other things, required the Bureau to provide water to the Exchange Contractors from sources other than Millerton. Doc. 3. On May 22, 2014, the Exchange Contractors moved to intervene in this matter as of right or in the alternative for permissive intervention. Doc. 24. On May 27, 2014, this Court granted the Exchange

Contractors' motion to intervene and denied the motion for a TRO. Docs. 44 & 45.

On July 28, 2014, Plaintiffs filed a first amended complaint ("FAC"), naming only Federal Defendants and raising two breach of contract claims, entitled "Breach of Contract/Adjudication of Contract Rights" and "Breach of Contract/CVPIA," respectively, as well as a takings claim. Doc. 62. Plaintiffs filed a corrected version of the FAC a few days later. Doc. 64.

On August 29, 2014, Plaintiffs filed their motion to transfer venue to the Court of Federal Claims. Doc. 71. On the same day, Grasslands filed a motion to intervene, Doc. 69, which Grasslands later clarified was a motion to intervene only for the purpose of being heard in connection with the motion to transfer. Docs. 73 & 84. The hearing on the motion to transfer venue was continued to allow full briefing and a decision on Grasslands' motion to intervene. Doc. 82. On October 17, 2014, the Court granted Grasslands' motion to intervene for the limited purpose of participating in the motion to transfer. Doc. 88.

### III. STANDARD OF DECISION

Transfer to the Court of Federal Claims is governed by 28 U.S.C. § 1631, which provides:

> Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

Under 28 U.S.C. 1631, transfer is warranted only when there is a "want of jurisdiction," transfer is "in the interest of justice," and the action "could have been brought at the time it was filed or noticed" in the transferee court. *Souders v. S. Carolina Pub. Serv. Auth.*, 497 F.3d 1303, 1307 n.4 (Fed. Cir. 2007)[7]; *see also Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1140 (9th Cir. 2008) (A case is

---

[7] As the Court of Federal Claims has exclusive jurisdiction over an interlocutory appeal from the denial of a motion to transfer an action to the Court of Federal Claims, 28 U.S.C. § 1292(d)(4)(A), the Federal Circuit advises district courts to apply the law of the Federal Circuit when deciding such motions. *Suburban Mortgage Associates, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1118, 1128 (Fed. Cir. 2007).

"transferable" when three conditions are met: "(1) the transferee court would have been able to exercise its jurisdiction on the date the action was misfiled; (2) the transferor court lacks jurisdiction; and (3) the transfer serves the interest of justice.").

## IV. DISCUSSION

### A.    Tucker Act Jurisdiction.

In determining whether transfer is appropriate, a key threshold issue is whether this Court lacks jurisdiction over the claims in the FAC. Relatedly, before transferring this action to the Court of Federal Claims, this Court must find that the Court of Federal Claims would have been able to exercise jurisdiction over the FAC when it was filed.[8] Both of these questions turn on an interpretation of the scope of the Tucker Act, which, in relevant part, gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1).

Here, Plaintiffs label their three causes of action as "Breach of Contract/Adjudication of Contract Rights," "Breach of Contract/CVPIA," and "Taking Without Just Compensation." Doc. 64 at 27-29. Each claim will be evaluated separately, as 28 U.S.C. § 631 "permit[s] the transfer of less than all of the claims in an action." *United States v. Cnty. of Cook, Ill.*, 170 F.3d 1084, 1089 (Fed. Cir. 1999); *Lan-Dale Co. v. United States*, 60 Fed. Cl. 299, 303 (2004) ("[Section 1631] allows [a court] to transfer claims over which [it] lacks jurisdiction to a court wherein jurisdiction is proper."); *see also Transohio*

---

[8] San Luis suggests that the relevant inquiry is whether the Court of Federal Claims could have exercised jurisdiction over the original complaint when *that* complaint was filed. Doc. 89 at 3-6. This is not the correct approach. As Plaintiffs point out in Reply, "[g]enerally, an amended pleading supersedes the original for all purposes." *Nolen v. Lufkin Indus., Inc.*, 469 F. App'x 857, 860 (Fed. Cir. 2012).

Thus, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007). By extension, this court on a number of occasions has looked to the complaint as amended to determine which forum has jurisdiction. *See, e.g., Chamberlain Group, Inc. v. Skylink Techs., Inc*., 381 F.3d 1178, 1189 (Fed.Cir. 2004) ("Federal Circuit jurisdiction depends on whether the plaintiffs complaint as amended raises patent law issues.")....

*Id.* The Court will look to the FAC to evaluate the factors relevant to transfer under 28 U.S.C. § 1631.

*Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) ("To resolve the sovereign immunity and jurisdiction questions," a court must "consider [the] claims individually.")(cited with approval in *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994)).

"In determining whether a claim falls within the exclusive jurisdiction of the Court of Federal Claims," the Federal Circuit indicates "courts must look to the true nature of the action, instead of merely relying on the plaintiff's characterization of the case." *Roberts v. United States*, 242 F.3d 1065, 1068 (Fed. Cir. 2001); *Bonneville, Wash. v. U.S. Dist. Court, W. Dist. of Washington*, 732 F.2d 747, 751 (9th Cir. 1984) (a court "should attempt to discern the real thrust of the case). Other Circuits have provided somewhat more practical rules about how to engage in such an analysis, rules that this court previously summarized:

> An action against the United States which is "at its essence" a contract claim lies within the [jurisdictional scope of the] Tucker Act, [over which] a district court has no subject matter jurisdiction. If a plaintiff's claim is "concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently of the contract the claim is founded upon a contract with the United States' and is therefore within the Tucker Act and subject to its restrictions on relief." *North Star Alaska v. [United States]*, 14 F.3d 36, 37 (9th Cir. 1994) []. *See also Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (Whether an action is founded upon a contract for purposes of the Tucker Act "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).")....
>
> The Court must examine the "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *North Star Alaska*, 14 F.3d at 37. The determination of whether a particular claim is essentially one ... in contract, must be made on a case by case basis by assessing the extent to which the contract is implicated in the claim asserted. *Darko v. U.S., Dept. of Agriculture, Farmers Home Admin.*, 646 F. Supp. 223, 227 (D. Mont. 1986).

*Dunbar-Kari v. United States*, No. CV-F-09-0389 LJO SMS, 2010 WL 4481767, at *4-5 (E.D. Cal. Nov. 1, 2010). Therefore, this Court must examine the "source of the rights" upon which the claims in the FAC are based, as well as the "type of relief sought."

//

//

**1.    Breach of Contract Claims.**

a.    **Source of Rights.**

Plaintiffs' first claim is entitled "Breach of Contract/Adjudication of Contract Rights." Their second claim is entitled "Breach of Contract/CVPIA." However, the general allegations of the FAC place great emphasis on statutory issues. For example, on pages 17-24 of the FAC, Plaintiffs lay out their position that: (1) CVPIA § 3406(d)'s provision of water to the wildlife refuges does not alter the Exchange Contractors' senior water rights; and (2) Reclamation may therefore not use Project water for any purposes authorized by the CVPIA until it has first satisfied its obligations to the Exchange Contractors. It is only if the Court accepts these two assertions that it might possibly find Reclamation has breached its contractual obligation not to "voluntarily and knowingly determine itself unable to deliver" substitute water to the Exchange Contractors, and therefore require itself to provide water to the Exchange Contractors from Millerton, water that would thus become unavailable for delivery to Plaintiffs.

The First Claim for Relief for "Breach of Contract/Adjudication of Contract Rights" purports to be narrowly focused on whether Federal Defendants breached their contractual obligations to Plaintiffs, alleging that Federal Defendants "breached the contracts between the United States and Friant Water Authority's members by voluntarily declaring the Bureau of Reclamation unable to supply the Exchange Contractors with its available substitute water, thereby depriving Plaintiffs of water to which they are entitled under their respective permanent contracts." FAC ¶ 100. But, the First Claim for Relief also expressly incorporates paragraphs 1 through 98 of the FAC, the vast majority of which discusses whether the CVPIA authorized the conduct that underpins Plaintiffs' breach of contract allegation.

The Second Claim for Relief directly concerns statutory issues, alleging "[t]here is no justification under federal law for Defendants' acts. In particular, the CVPIA does not authorize the Bureau of Reclamation to use water for purposes under the [CVPIA] unless and until Reclamation has first met its obligations to deliver substitute water to the Exchange Contractors." *Id*. at ¶ 105.

Plaintiffs maintain that the statutory issues (e.g., compliance with the CVPIA) arise only in the context of an affirmative defense to nonperformance (i.e., that Federal Defendants conduct was not "voluntary" because it was mandated by law), and that, therefore, it is improper to consider the statutory issues when determining jurisdiction for transfer purposes. Doc. 95 at 6 n.13. It is true that an affirmative defense, even one that is anticipated in the complaint, cannot create federal subject matter jurisdiction. *See Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003); *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392-93 (1987). Notably, subject matter jurisdiction is not disputed or disputable in this case. *See Katz v. Cisneros*, 16 F.3d 1204, 1207-08 (Fed. Cir. 1994) ("Even where a case is contractual ... the presence of issues which require the interpretation of federal law and regulation necessarily give rise to federal questions.") (citing *Conille v. Secretary of Housing and Urban Development*, 840 F.2d 105, 109 (1st Cir.1988) ("It is well established that cases involving the rights and obligations of the United States or one of its agents under a contract, entered into pursuant to authority conferred by federal statute, are governed by federal law.")). The Court can locate no cases that directly apply the well-pleaded complaint rule to determining whether a complaint is contractual for purposes of the Tucker Act's sovereign immunity waiver. Nevertheless, it seems logical to extend the doctrine to sovereign immunity waiver statutes, as was discussed in a Sixth Circuit concurring opinion: *B & B Trucking, Inc. v. U.S. Postal Serv*., 406 F.3d 766, 772 (6th Cir. 2005) (J. Cole, concurring) (discussing how the existence of a viable contract-based defense does not render a claim "contractual" in nature). What is more clear is that the relevant caselaw focuses closely on a corollary to the well-pleaded complaint rule: the artful pleading doctrine, which requires a court to "look[ ] past the surface allegations to make its own assessment of what law the claim arises under." *Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc*., 272 F.3d 912, 914 (7th Cir. 2001); *Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998) ("Court of Federal Claims jurisdiction cannot be circumvented by such artful pleading and, accordingly, we customarily look to the substance of the pleadings rather than their form."). Judge Cole's concurrence in *B & B Trucking*, 406 F.3d at 771-72, helps explain the relationship between these two doctrines. In that case, the plaintiffs, a group of

independent truckers who transported mail for the U.S. Postal Service, complained that the Postal

Service was "interfering with their Fifth Amendment rights." *Id*. at 771. However, the types of

interference they described "d[id] not involve any actions other than instructions to comply with contract

provisions." *Id*.

> For example, the truckers claim that the USPS is intruding upon their land,
> in violation of their Fifth Amendment rights, by requiring fuel suppliers to
> fill the fuel tanks at the truckers' depots. But armed federal officers are not
> physically intruding onto the truckers' land and pumping unwanted fuel
> into the truckers' fuel tanks. Rather, the USPS has merely amended the
> contracts, in accordance with the terms of those contracts, and instructed
> the truckers to comply with the new terms. The truckers, of course, could
> refuse to comply, and risk losing their contracts or being in breach, but no
> actual "trespass" or "taking" is occurring outside of the bounds of the
> contract mechanism. Thus these claims are essentially contractual, despite
> the truckers' efforts to cloak them in Fifth Amendment garb; any "taking"
> or interference with the truckers' property that has occurred here has only
> occurred via contractual means, just as any "rights" with which the USPS
> is interfering are those resulting from the contracts.... Accordingly, these
> claims are "essentially contractual."

*Id*. at 771-72.

In reaching this conclusion, Judge Cole concluded "it is not important that the USPS's defense

would be based on the contracts at issue. [T]he existence of a viable contract-based defense does not

render district court jurisdiction inappropriate." *Id*. at 772. Judge Cole continued:

> For example, suppose the aforementioned armed federal agents had
> entered onto the truckers' property without permission, asserting "We are
> only pumping fuel here because the contracts say we can." In such a
> situation, I would have no difficulty finding district court jurisdiction over
> the truckers' Fifth Amendment trespass claims, despite the fact that the
> government's defense would rely exclusively on rights granted by
> contract. However, the appropriate inquiry (in which I take the majority
> opinion to have engaged, and with which I agree) does not take possible
> defenses into account. Rather, it examines the claims to determine their
> underlying source and whether the claims are merely being artfully
> pleaded to avoid the CDA's jurisdictional bar. In the instant case such an
> inquiry results in a determination that the truckers' complaint effectively
> asserts only contractual causes of action cloaked in non-contractual
> language. I reach this conclusion without reference to the USPS's possible
> defenses.

*Id*. (emphasis added).

1    Here, Plaintiffs allege that Federal Defendants have breached Article 3(n) of the contracts

2    between Plaintiffs and the United States, which provides that the United States "will not voluntarily and

3    knowingly determine itself unable to deliver to the Exchange Contractors entitled thereto from water

4    that is available or that may become available to it from the Sacramento River and its tributaries or the

5    Sacramento-San Joaquin Delta those quantities required to satisfy the obligations of the United States

6    under said Exchange Contract." FAC ¶ 59 & Ex. 1, art. 3(n). Plaintiffs are technically correct that

7    commands contained within the CVPIA are relevant to the breach of contract claim because they are an

8    affirmative defense to a finding that Federal Defendants "voluntarily" determined themselves unable to

9    deliver Sacramento River water to the Exchange Contractors. But, this is not dispositive. The Court must

10   still determine the underlying source of the claim and whether the claim is a statutory claim cloaked in

11   contract language. A careful examination of the FAC leads this Court to answer this question in the

12   affirmative. The conduct complained of is Federal Defendants' decision to allocate certain volumes of

13   water to Grasslands pursuant to the CVPIA, and Federal Defendants' resulting decision to release water

14   from Millerton to the Exchange Contractors, instead of to Plaintiffs. The FAC does not seek

15   interpretation of any contract term. The Second Claim for Relief specifically seeks a declaration that

16   "the decision to supply available water to the Grassland and other wildlife refuges was not required by

17   the CVPIA, and is contrary to law and the terms of the contracts." *Id.* at ¶ 107. Elsewhere, the FAC

18   requests a finding under the APA that Federal Defendants' actions were "arbitrary, capricious, an abuse

19   of discretion, and otherwise not in accordance with law" and/or "in excess of statutory jurisdiction,

20   authority, or limitation, or short of statutory right," among other things. FAC ¶ 98. While this request is

21   relegated to the general allegations section of the FAC, rather than assigned to a particular Claim for

22   Relief, its presence simply underscores the thrust of the first 97 paragraphs of the complaint, which, as

23   explained above, are exclusively concerned with whether Federal Defendants' conduct violated federal

24   statutory commands.

25           The breach of contract claims are both, at their cores, statutory in nature.

26

                                                    14

b.      **Relief Sought.**

The "type of relief sought" is also relevant. The prayer for relief requests a money judgment "in an amount that is currently unknown but believed to be over $1 billion." FAC at 29-30. But, in the event this Court retains jurisdiction, Plaintiffs also request an order declaring that "Reclamation is obligated to use any water it diverts from the Delta to supply the Exchange Contractors with substitute water before it may use any water for any other Central Valley Project purpose." FAC at 30.

Where the plaintiff seeks prospective relief, jurisdiction will likely lie with the district court, not the Court of Federal Claims. *See Katz*, 16 F.3d 1209. In *Katz*, for example, the plaintiff sought adjudication of the lawfulness of a government agency's regulatory interpretation. *Id*. Relatedly, in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court compared a situation in which a plaintiff sought damages under circumstances that would have no significant prospective effect because the challenge only concerned money allegedly past due, to a situation in which the challenge would have prospective impact "in light of the rather complex ongoing relationship between the parties." *Id*. at 893-94, 906. In the latter circumstance, the district court would have jurisdiction to fashion prospective relief. *Id*. at 906; *but see Brazos*, 144 F.3d at 784 (distinguishing *Bowen* where plaintiff, despite having filed claim under the APA, would be completely remedied by money judgment pursuant to contract with United States, because there was no ongoing relationship between plaintiff and the government to monitor and referee). In *Bowen*, the Supreme Court also held that the district court did have jurisdiction to grant monetary relief under certain circumstances, such as when the plaintiff is seeking to enforce a statutory mandate for the payment of money. *Id*. at 900. No party argues that this Court has jurisdiction to order monetary relief in the instant case. However, equitable relief has also been requested.

Here, the Court believes the ongoing relationship between the plaintiffs and the United States, coupled with the fact that the breach of contract claims seek equitable relief in the alternative support a finding that the claims are not contractual in nature. Accordingly, the Court will interpret both Breach of Contract claims as arising under the APA and will assume jurisdiction over them.

This conclusion is reached notwithstanding the Court's prior determination, in denying

15

Plaintiffs' request for a TRO, that it lacked jurisdiction over the first claim for relief in the original complaint, which requested adjudication of rights under the contracts between Plaintiffs, Grassland, and the United States. Doc. 1 at ¶¶ 76-83. Plaintiffs alleged that Reclamation's conduct violated Article 3(n) of the contracts between Plaintiffs and the United States, *id*. at ¶ 79, the same contractual provision discussed above. This Court preliminarily concluded that these allegations amounted to a direct suit against the United States on the theory that Reclamation violated Article 3(n) of Plaintiffs' contracts. This Court then proceeded to examine whether it had jurisdiction over such a claim, focusing on the Little Tucker Act, 28 U.S.C. § 1346(a)(2); and the Reclamation Reform Act, 43 U.S.C. § 390uu . Doc. 45 at 13-16.

First, this Court preliminarily found that it lacked jurisdiction to adjudicate Plaintiffs' original contract claim under the Little Tucker Act:

> The Little Tucker Act gives district courts concurrent jurisdiction over claims against the United States based upon express or implied contracts seeking money damages not exceeding $10,000. 28 U.S.C. § 1346(a) (2). But, as to all other contract claims, 28 U.S.C. § 1491 gives the Court of Federal Claims exclusive jurisdiction to award money damages and "impliedly forbids declaratory and injunctive relief, [which likewise] precludes a § 702 waiver of sovereign immunity" for such claims. *Tucson Airport Auth. v. Gen. Dynamics Corp*., 136 F.3d 641, 646 (9th Cir. 1998). The Ninth Circuit has likewise extended this holding to the Little Tucker Act. *See N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993); *see also Ministerio Roca Solida v. U.S. Dep't of Fish & Wildlife*, 288 F.R.D. 500, 505 (D. Nev. 2013) (finding claims for declaratory and injunctive relief premised upon the Little Tucker Act are impliedly prohibited); *see also Gengler v. U.S. ex rel. its Dep't of Def. & Navy*, 453 F. Supp. 2d 1217, 1228 (E.D. Cal. 2006). This Court cannot exercise jurisdiction under the Little Tucker Act over Plaintiffs' contract claim for declaratory and injunctive relief.

Doc. 45 at 15 (footnotes omitted).

Next, this Court preliminarily concluded the Reclamation Reform Act, 43 U.S.C. § 390uu, did not waive the United States' sovereign immunity to be "sued alone" in a contract dispute:

> Section 390uu grants consent "to join the United States as a necessary party defendant in any suit to adjudicate" certain rights under a federal reclamation contract. (Emphasis added.) This language is best interpreted to grant consent to join the United States in an action between other parties-for example, two water

16

districts, or a water district and its members-when the action requires construction of a reclamation contract and joinder of the United States is necessary. It does not permit a plaintiff to sue the United States alone.

[*Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 602 (9th Cir. 1993)]; *see also Frenchman Cambridge Irr. Dist. v. Heineman*, 974 F. Supp. 2d 1264, 1281 (D. Neb. 2013) (district court jurisdiction under 43 U.S.C. § 390uu "foreclosed by the Supreme Court's holding that the statute waives immunity only in actions in which the United Sates is joined as a party, and not in direct actions against the United States"). This is precisely what Plaintiffs attempt to do here with their First Claim for Relief -- sue the United States directly for breach of contract. The Court lacks jurisdiction to adjudicate such a claim, so the claim cannot form the basis of a finding of likelihood of success on the merits.

Doc. 45 at 13. Both of these conclusions – regarding the Little Tucker Act and the Reclamation Reform Act – were premised on the assumption that the first cause of action in the original complaint was a contract claim. Federal Defendants, Grasslands, and San Luis affirmatively argued as much at the TRO stage, asserting jurisdiction was lacking because neither the Little Tucker Act or Reclamation Reform Act provided this Court with jurisdiction over the contract claim in question. Now, as discussed above, the tune has changed. Under certain circumstances, the law of the case doctrine would preclude this Court from acting contrary to a prior ruling, because "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Arizona,* 677 F.3d 383, 389 n. 4 (9th Cir. 2012) (en banc). In general, however, "decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.,* 499 F.3d 1108, 1114 (9th Cir. 2007). This is true for the reason that a preliminary injunction decision is just that: preliminary. *Id.* "This rule acknowledges that 'decisions on preliminary injunctions ... must often be made hastily and on less than a full record.' " *Id.* (quoting *S. Or. Barter Fair v. Jackson Cnty.,* 372 F.3d 1128, 1136 (9th Cir. 2004)). This rule would apply with even more force to a ruling on a TRO. Moreover, the FAC has supplanted the original Complaint, arguably rendering the prior jurisdictional ruling inapposite.

In sum, this Court has jurisdiction over the first two claims to the extent they request equitable relief available under the APA. This Court does not have jurisdiction to grant any request for damages,

1    as such a remedy is not available in this Court. So, the prayers for damages are stricken, *sua sponte*.

2         In the event the Court denies their motion to transfer, Plaintiffs request leave to amend to

3    reframe their claims. Doc. 71 at 10. As discussed above, this Court has jurisdiction over many aspects of

4    the FAC as it is currently articulated. However, the litigation would proceed more smoothly if Plaintiffs

5    reframed their claims. Plaintiffs' request is GRANTED as to the "breach of contract" claims. Any

6    amended complaint shall be filed by December 19, 2014.

7         **2.      Takings Claim.**

8         Plaintiffs' takings claim requires separate analysis. It is plainly obvious that this Court lacks and

9    the Court of Federal Claims would have jurisdiction over Plaintiffs' takings claim, which requests

10   damages "over $1 billion." FAC at 30; *see In re Nat'l Sec. Agency Telecommunications Records Litig*.,

11   669 F.3d 928, 932 (9th Cir. 2011). Pursuant to 28 U.S.C. § 1631, if a "court finds that there is a want of

12   jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal...." However,

13   "[t]he phrase 'if it is in the interest of justice' relates to claims that are <u>nonfrivolous</u> and, as such, should

14   be decided on the merits." *Krikmanis v. Bush*, 956 F.2d 1171 (Fed. Cir. 1992) (table) (emphasis added).

15   Those appeals that involve legal points not arguable on their merits are frivolous. *Id*.

16        As to the takings claim, Federal Circuit authority clearly bars takings claims premised upon the

17   United States' violation of a statute. This is because "in a takings case, [the Court of Federal Claims]

18   assume[s] that the underlying governmental action was <u>lawful</u>." *Lion Raisins Inc. v. United States*, 416

19   F.3d 1356, 1370 (Fed. Cir. 2005) (emphasis added). Here, the taking claim alleged in this case is

20   premised upon the underlying allegation that Reclamation failed to correctly implement provisions in

21   the CVPIA, and, therefore, that Reclamation breached its contractual obligation to avoid rendering itself

22   voluntarily unable to deliver water to Plaintiffs. There can be no dispute that Plaintiffs maintain

23   Reclamation acted unlawfully. (If Reclamation acted pursuant to a legal obligation, Plaintiffs would

24   have no contractual right to the water in question because Reclamation would not have withheld the

25   water "voluntarily.") Therefore, the takings claim is frivolous and it would not be in the interests of

26   justice to transfer it to the Court of Federal Claims. The motion to transfer the takings claim is DENIED.

The takings claim is DISMISSED WITHOUT LEAVE TO AMEND, because there is no waiver of

sovereign immunity that is even arguably applicable in this venue. Fed. R. Civ. P. 12(h)(3)("If the court

determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see*

*Southern Pacific Transportation Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990).

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) The motion to transfer is DENIED.

    (a) Both breach of contract claims are actually statutory in nature and fall within the

jurisdiction of this Court to the extent they claims request equitable relief available under the APA. The

prayers for damages associated with these claims are STRICKEN.

    (b) The takings claim is not subject to transfer because it is frivolous. That claim is

DISMISSED WITHOUT LEAVE TO AMEND.

(2) Plaintiffs' request for leave to amend is GRANTED as to the "breach of contract" claims.

Plaintiffs shall file an amended complaint on or before December 19, 2014.

IT IS SO ORDERED.

Dated:   __**December 1, 2014**__         _____**/s/ Lawrence J. O'Neill**
UNITED STATES DISTRICT JUDGE